**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN KAFEL, | Civil Action No.: |
| Plaintiff, | **NOTICE OF REMOVAL** |
| v. | State Court No. CV-20-940205 (Court of Common Pleas, Cuyahoga County, OH) |
| GENERAL MOTORS LLC, | |
| Defendant. | JURY TRIAL DEMANDED |

**<u>EXHIBIT A TO NOTICE OF REMOVAL - COMPLAINT</u>**

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| JOHN KAFEL<br>8330 Russell Ln.<br>Cleveland, Ohio 44144<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC<br>c/o Corporation Service Company<br>50 West Broad St., Suite 1330<br>Columbus, OH 43215<br><br>Defendant. | Case No.<br><br>Judge<br><br>**COMPLAINT**<br>**WITH JURY DEMAND** |

Plaintiff John Kafel, by and through undersigned Counsel, submits the following

Complaint for damages against Defendant General Motors LLC and alleges as follows:

## JURISDICTIONAL ALLEGATIONS

1.     Plaintiff John Kafel is a resident of Ohio at the captioned address.

2.     Defendant General Motors LLC ("GM") is a foreign limited liability

company, registered with the Secretary of State to do business in Ohio, which maintains

a statutory agent at the captioned address.

3.      At all relevant times, Defendant conducted automobile manufacturing operations at the General Motors Parma Metal Center which is located at 5400 Chevrolet Blvd in Parma, Ohio (the "Premises").

4.      The incident which is the subject of this Complaint occurred on the Premises in Cuyahoga County.

5.      Pursuant to Rule of Civil Procedure 3(C)(2), 3(C)(3), and/ or 3(C)(6), the proper venue for this action is Cuyahoga County.

## GM WAS A POSSESSOR OR OCCUPIER OF THE BUSINESS PREMISES

6.      At all relevant times, GM was in both possession and control of the Premises. GM's possession and control over the Premises was both physical and actual.

7.      At all relevant times, GM had the legal right and/or contractual authority to admit and exclude people from the Premises.

8.      At all relevant times, GM was the possessor or occupier of the Premises.

## PLAINTIFF WAS A BUSINESS INVITEE AND/OR FREQUENTER

9.      At all relevant times, Plaintiff John Kafel was employed by non-party Stone Transport, LP, ("Stone Transport") as a truck driver.

10.      On or before March 25, 2019, GM retained Stone Transport to load and haul scrap metal away from the Premises. Stone Transport assigned Plaintiff to work at the "baler building" on the Premises.

11.      At all relevant times, Plaintiff was lawfully on the Premises.

12.     At all relevant times, Plaintiff was on the Premises for the economic benefit of GM.

13.     At all relevant times, Plaintiff was on the Premises as a business invitee.

14.     At all relevant times, Plaintiff was a "frequenter" of the Premises as that term is defined by the Ohio Revised Code.

## THE PROCESS OF BALING SCRAP METAL
## AT THE GENERAL MOTORS PARMA METAL CENTER

15.     The General Motors Parma Metal Center is a metal stamping facility and assembly plant which processes over 500 tons of steel per day.

16.     As the press systems inside the facility stamp the steel into automobile parts, the unused steel or "scrap metal" falls onto conveyor belts below the presses.  Each conveyor belt continuously transports scrap metal to a main conveyor belt.

17.     The main conveyor belt carries the scrap metal out of the stamping facility and into a "baler building" on the Premises.

18.     Inside the baler building, the main conveyor belt transports the scrap metal onto a baler device which drops the scrap metal into semi tractor-trailers positioned below.

19.     In March 2019, the General Motors Parma Metal Center was operating 3 shifts per day, 5 days per week.

20.     In March 2019, the conveyor belt system continuously transported scrap metal onto the baler device 24 hours per day when the stamping facility was in operation.

21. Stone Transport kept multiple trailers at the Premises so the continuous flow of scrap metal could be baled into awaiting trailers and subsequently hauled away from the Premises by Stone Transport drivers.

22. Plaintiff's primary responsibility was to operate the baler device and to move trailers, or direct other drivers to move trailers, into position to be loaded with scrap metal.

23. Stone Transport typically kept at least two semi-trucks ("tractors") at the Premises which Plaintiff used to position and re-position the trailers beneath the baler device.

24. The process for loading scrap metal into trailers required Plaintiff to continually position two semi-tractor trailers side-by-side beneath the arm of the baler device. The arm of the baler device would be positioned directly above one of the trailers. Scrap metal, continuously pushed forward by the conveyor belt, would fall from the baler arm into the trailer below. As the scrap metal fell from the baler device, it formed a pile inside the trailer below.

25. From a shed inside the baler building, Plaintiff used computer-based controls to move the baler arm back-and-forth between trailers.

26. As a pile of scrap metal reached the top of one trailer's walls, the baler arm would be repositioned over the second awaiting trailer. This was necessary to prevent scrap metal from spilling out of the trailers onto the floor of the baler building.

27.     GM did not permit Stone Transport driver/loaders, including Plaintiff, to turn off the conveyor belt for any reason.

28.     Stone Transport driver/loaders, including Plaintiff, had no ability to stop the constant flow of scrap metal from being delivered by the conveyor belt and falling from the baler arm.

29.     Once a pile of scrap metal reached its maximum height in one trailer and the baler arm was shifted over to begin filling the second trailer, Plaintiff was required to move quickly to either drive the first semi tractor-trailer forward or give direction to another driver as to how far to pull the semi tractor-trailer forward so as to position it to accept another pile of scrap metal.

30.     It would take 3-5 piles of scrap metal to fill a semi-trailer to maximum capacity. Thus, Plaintiff was required to repeatedly re-position the semi tractor-trailers and the baler arm throughout the process. As one trailer reached maximum capacity, it was moved out of the baler building and replaced by an empty trailer pulled by a tractor.

31.     GM, directly or through its employees or agents, installed mirrors on the ceiling of the building so Stone Transport's driver/loaders, including Plaintiff, could see inside the trailers as they were being loaded by the baler device.

32.     Driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors during the baling process to ensure that each pile of scrap metal reached maximum height.

33.     Driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors during the baling process to ensure that the baler arm was shifted before scrap metal spilled out of a trailer onto the floor of the building.

34.     Driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors during the baling process to determine how far a semi tractor-trailer should be pulled forward in order to accept more scrap metal without any of the material spilling out of the trailer onto the floor of the building.

35.     Driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors during the baling process to in order to ensure that each trailer was filled to its maximum capacity with scrap metal.

36.     At all relevant times, driver/loaders, including Plaintiff, were required by the process to work with a high degree of urgency to both shift the baler arm and reposition the trailers so as to prevent scrap metal from spilling out onto the floor of the building.

37.     At all relevant times, driver/loaders were required by the process to continually focus their attention on the ceiling mirrors as the conveyor belt continued to push scrap metal off the baler device.

## GM'S DUTY OF CARE

38.     At all relevant times, GM owed business invitees and/or frequenters, including Plaintiff, a duty of ordinary care.

39.     At all relevant times, GM owed business invitees and/or frequenters, including Plaintiff, a duty to maintain the Premises in a safe condition.

40.     At all relevant times, GM owed business invitees and/or frequenters, including Plaintiff, a duty to eliminate unreasonable risks of harm on the Premises.

41.     At all relevant times, GM owed business invitees and/or frequenters, including Plaintiff, a duty to warn them of latent or concealed dangers or hazards on the Premises.

42.     On and before March 25, 2019, the floor of the baler building was in poor condition.

43.     Prior to March 25, 2019, years of heavy trucks and/or semi-tractor trailers repeatedly driving inside the building and being loaded with scrap metal had caused the floor of the building to deteriorate.

44.     On and before March 25, 2019, the floor of the baler building was riddled with defects, depressions, cracks, potholes, deteriorating asphalt or concrete, abandoned railroad tracks, uneven surfaces, protruding metal grates, and remnant drainage ditches (collectively "defects").

45.     Prior to March 25, 2019, driver/loaders had tripped and/or been injured from tripping on defects in the floor of the baler building.

46.     Prior to March 25, 2019, GM, directly or through its employees or agents, had received complaints and/or reports or had generated reports related to the defects in and poor condition of the baler building floor.

47.     Prior to March 25, 2019, GM, directly or through its employees or agents, knew or should have known, that the floor of the baler building was in poor condition.

48.     Prior to March 25, 2019, GM, directly or through its employees or agents, knew or should have known that the floor of the bailer building was riddled with defects, including the remnant drainage ditch or defect which ultimately caused Plaintiff to trip.

49.     Prior to March 25, 2019, GM, directly or through its employees or agents, knew or should have known that the presence of large semi-tractor trailers and/or the process of baling scrap metal into trailers may obstruct, obscure, conceal, or otherwise render one or more of the defects not reasonably observable to driver/loaders, including Plaintiff, while working in the baler building.

50.     Prior to March 25, 2019, GM installed mirrors on the ceiling of the building because it wanted and expected driver/loaders, including Plaintiff, to look up at the mirrors to ensure that each pile of scrap metal inside a trailer reached maximum height.

51.     On and before March 25, 2019, GM, directly or through its employees or agents, knew or should have known that driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors while working in the baler building in order to ensure that each pile of scrap metal reached maximum height.

8

52.     Prior to March 25, 2019, GM installed mirrors on the ceiling of the baler building because it wanted and expected driver/loaders, including Plaintiff, to look up at the mirrors to ensure that scrap metal dropping from the baler device into trailers did not spill out onto the floor of the baler building.

53.     On and before March 25, 2019, GM, directly or through its employees or agents, knew or should have known that driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors while working in the baler building in order to ensure that scrap metal dropping from the baler device into trailers did not spill out onto the floor.

54.     Prior to March 25, 2019, GM installed mirrors on the ceiling of the baler building because it wanted and expected driver/loaders, including Plaintiff, to look up at the ceiling mirrors to determine how far a semi tractor-trailer needed to be pulled forward in order to accept more scrap metal without any of the material spilling out of the trailer onto the floor of the building while ensuring the trailer was filled to maximum capacity.

55.     On and before, March 25, 2019, GM, directly or through its employees or agents, knew or should have known that driver/loaders, including Plaintiff, needed to look up at the ceiling mirrors to determine how far a tractor-trailer should pull forward in order to accept more scrap metal without any of the material spilling out of the trailer onto the floor of the building while ensuring the trailer was filled to maximum capacity.

56.     On and before March 25, 2019, GM, directly or through its employees or agents, wanted and expected driver/loaders, including Plaintiff, to work with a high degree of urgency to both shift the baler arm and to reposition the trailers so as to prevent scrap metal from spilling out onto the floor of the building and to ensure that each trailer was filled to maximum capacity.

57.     On and before March 25, 2019, GM, directly or through its employees or agents, knew or should have known that driver/loaders, including Plaintiff, were required by the baling process to work with a high degree of urgency to both shift the baler arm and to reposition the trailers so as to prevent scrap metal from spilling out onto the floor of the building and to ensure that each trailer was filled to maximum capacity.

58.     On and before March 25, 2019, GM, directly or through its employees or agents, knew or should have known that driver/loaders, including Plaintiff, were required by the baling process to continually focus their attention on the ceiling mirrors as the conveyor belt continued to push scrap metal off the baler device.

59.     Prior to March 25, 2019, GM, directly or through its employees or agents, knew or should have known that the baling process and/or the equipment used in the baling process created attendant circumstances which could divert the attention of driver/loaders, including Plaintiff, away from observing or recognizing one or more of the defects in the baler building floor. These attendant circumstances included, but were not limited to, a) a driver/loader's, including Plaintiff's, need to look up at the mirrors

positioned on the ceiling to determine the size of the piles and proper position of a trailer to receive more scrap metal; b) the urgency with which driver/loaders, including Plaintiff were required to reposition the trailers and the baler arm during the process so as to prevent scrap metal from spilling out of the trailers; c) the visual obstructions created by the presence of large semi-tractor trailers in the building; and/or d) the overall deteriorated condition of the floor.

60.     At all relevant times, one or more of the defects was not reasonably observable to driver/loaders, including Plaintiff, while they were engaged in the tasks required by the baling process. This included the remnant drainage ditch or defect which ultimately caused Plaintiff to trip, fall, and sustain injuries.

61.     At all relevant times, it was reasonably foreseeable to GM, either directly or through its employees or agents, that its failure to repair, replace, and/or remove the defects could cause one or more of the driver/loaders, including Plaintiff, to trip and sustain serious injuries. This included the remnant drainage ditch or defect which ultimately caused Plaintiff to trip, fall, and sustain injuries.

62.     GM, directly or through one or more of its employees or agents, knew or should have known that the deteriorated floor in the bailer building was not in a reasonably safe condition and it was foreseeable to GM that the deteriorated floor would cause injury to Plaintiff.

63.     GM, directly or through one or more of its employees or agents, knew or should have known that the deteriorated floor in the baler building was not in compliance with industry standards, state or local building codes, and/ or OSHA regulations.

64.     GM, directly or through its employees or agents, knew or should have known that the deteriorated floor in the baler building was a known safety hazard and not in compliance with OSHA regulations.

65.     GM, directly or through one or more of its employees or agents, failed to comply with OSHA standards, specifically those standards related to maintenance and repair of walking-working surfaces, including but not limited to, regulations 1910.22(a) and (d)(1) - (d)(3) surface conditions and their inspection, maintenance and repair.


**THE INCIDENT**

66.     On or about March 25, 2019, Plaintiff was working in the baler building on the Premises.

67.     There were two semi tractor-trailers positioned in the area beneath the baler device.  As the pile of scrap metal in the first trailer ("tractor-trailer #1") reached the top of the trailer walls, Plaintiff repositioned the baler arm over the second semi tractor-trailer ("tractor-trailer #2") so scrap metal would not spill out of the first trailer onto the floor of the bailer building.

68.     Once the bailer arm was repositioned over the second trailer, Plaintiff left the shed in order to direct the driver of tractor-trailer #1 as to how far they needed to pull forward so the trailer would be positioned properly to receive another pile of scrap metal.

69.     In order to give direction to the driver of tractor-trailer #1, Plaintiff repeatedly looked up at the ceiling mirrors to determine how far tractor-trailer #1 needed to move forward to accept another pile of scrap metal.

70.     In order to determine how much time remained to position tractor-trailer #1 and to ensure that the baler arm was properly dropping scrap metal into tractor-trailer #2, Plaintiff also repeatedly looked up at the ceiling mirrors to check the status of the pile growing in tractor-trailer #2.

71.     As Plaintiff was walking on the floor of the building, his view of one or more of the defects, including the remnant drainage ditch or defect which ultimately caused him to trip, fall, and sustain injury, was obstructed by the presence the large semi tractor-trailers used in the bailing process.

72.     As Plaintiff was walking on the floor of the building, attempting to provide directions to the driver of tractor-trailer #1, and/or monitoring the status of scrap metal falling from the baler arm into tractor-trailer #2, he stepped into a large, remnant drainage ditch or defect in the floor caused him to trip and fall hard to the ground, striking the left side of his body.

73.     At all relevant times, GM, directly or through its employees or agents, retained control of over of the conveyor belt which continuously delivered scrap metal to the baler device and required Plaintiff to repeatedly and urgently reposition the baler arm, reposition the tractor-trailers, and to focus on the ceiling mirrors to ensure that scrap metal from the conveyor belt would continuously flow into the trailers without interruption and without spilling out onto the floor.

74.     At all relevant times, the conveyor belt which continuously delivered scrap metal to the baler device was a critical variable in Plaintiff's work.

75.     By at all relevant times retaining control over the conveyor belt which continuously delivered scrap metal to the baler device, GM, directly or through its employees or agents, controlled a critical variable in Plaintiff's work.

76.     At all relevant times, GM, directly or through its employees or agents, retained control over the ceiling mirrors in the baler building.

77.     At all relevant times, the ceiling mirrors constituted a critical variable in Plaintiff's work and/or work environment.

78.     By at all relevant times retaining control over the ceiling mirrors which driver/loaders relied upon in the bailing process, GM, directly or through its employees or agents, controlled a critical variable in Plaintiff's work and/or work environment.

79.     At all relevant times, GM, directly or through its employees or agents, retained control over the maintenance and repair of the floor in the bailer building.

80.     At all relevant times, the floor in the bailer building, including the many hazards created by its deteriorated condition, constituted a critical variable in Plaintiff's work environment.

81.     By at all relevant times, retaining control over the maintenance and repair of the floor in the bailer building, GM, directly or through its employees or agents, controlled a critical variable in Plaintiff's work environment.

82.     At all relevant times, the hazard posed by the remnant drainage ditch or defect to driver/loaders, including Plaintiff, while engaged in the baling process, was neither open nor obvious.

83.     At all relevant times, the remnant drainage ditch or defect constituted a latent defect or hazard.

84.     At all relevant times, GM failed to abate the hazard created by the remnant drainage ditch or defect.

85.     At all relevant times, GM failed to reasonably repair or replace the remnant drainage ditch or defect.

86.     At all relevant times, GM failed to warn Plaintiff of the latent defect or hazard created by the remnant drainage ditch or defect during the baling process.

87.     At all relevant times, Plaintiff was paying reasonable attention.

88.     Plaintiff was not negligent.

89.     Plaintiff did not cause or contribute to causing the March 25, 2019 incident in which he tripped, fell, and sustained injury at the Premises.

90.     No third party, other than GM or one or more of GM's employees or agents, was negligent relative to the incident in which Plaintiff was injured.

91.     No third party, other than GM or one or more of GM's employees or agents, caused or contributed to the incident in which Plaintiff was injured at the Premises.

**CAUSE OF ACTION:**
**NEGLIGENT, RECKLESS, WILLFUL, AND WANTON MISCONDUCT**

92.     Plaintiff realleges, and incorporates by reference, each and every allegation in each and every paragraph of this Complaint as if fully rewritten herein.

93.     GM owed a duty to all frequenters and/ or business invitees, including Plaintiff, to take all reasonable steps necessary to render the work area in the baler building safe.

94.     GM owed a duty to business invitees, including Plaintiff, to keep the Premises in a reasonably safe condition.

95.     GM, directly or through its employees or agents, knew or should have known that its failure to repair, remove, and/or replace the defects in the baler building floor, including the remnant drainage ditch or defect which ultimately caused Plaintiff to trip, could cause serious injury to driver/loaders, including Plaintiff, while engaged in the baling process or working in the baler building.

96.     GM, owed a duty to business invitees, including Plaintiff, to warn them about latent defects or hazards, including the remnant drainage ditch or defect which ultimately caused Plaintiff to trip.

97.     GM, directly or through its employees and/or agents, failed to take all reasonable steps necessary to render the work area in the baler building safe.

98.     GM, directly or through its employees and/or agents, failed to keep the Premises in a reasonably safe condition.

99.     GM, directly or through its employees and/or agents, failed to take all reasonable steps to repair and/or replace defects in the baler building floor, including the remnant drainage ditch or defect which ultimately caused Plaintiff to trip.

100.    In breaching one or more of its duties owed to Plaintiff, GM was negligent.

101.    In breaching one or more of their duties owed to Plaintiff, one or more of GM's employees or agents was negligent.

102.    As a direct and proximate result of Defendant's negligence, and/or the negligence of one or more of its employees or agents, Plaintiff sustained injuries of a personal, pecuniary, and permanent nature, including, but not limited to, serious bodily injuries, scarring, disfigurement, pain and suffering, mental anguish, medical expenses now and into the future, personal property losses and expenses, lost wages, loss of earning capacity, loss of enjoyment of life, and other damages to be proven at the trial of this matter.

103.    With reasonable certainty, Plaintiff will require future medical treatment and will incur additional economic damages, including future medical bills, for his physical injuries and emotional distress directly and proximately caused by Defendant's negligence and/or the negligence of its employees or agents.

104.    Defendant is vicariously liable for its employees' or agents' negligence which directly and proximately caused injury to Plaintiff.

105.    In breaching its duties as set forth in this Complaint, Defendant, directly or through the actions or inactions of one or more of its employees or agents, was reckless.

106.    Defendant, directly or through one or more of its employees or agents, was reckless in the maintenance, inspection, and repair of the baler building floor.

107.    In breaching its duties as set forth in this Complaint, Defendant, directly or through the actions or inactions of its employees or agents, demonstrated a conscious disregard for the rights and safety of driver/loaders engaged in the baling process inside the baler building, including Plaintiff.

108.    In breaching its duties as set forth in this Complaint, Defendant's misconduct, and/or the misconduct of one or more of its employees or agents was willful. They intentionally failed to do that which should be done. They knew or should have known that such conduct would probably cause injury to others, including Plaintiff. They intentionally disregarded clear duties and definite rules of conduct. They had a purpose not to discharge those duties.

109. In breaching its duties, as set forth in this Complaint, Defendant's misconduct, and/or the misconduct of one or more of its employees or agents, was wanton. They were aware, from their knowledge of the circumstances and conditions that their misconduct would probably result in injury. They failed to use any care for the Plaintiff. They had an indifference to the consequences of their actions and/or omissions, when the probability was those actions and/or omissions would result in great harm, which they should have appreciated.

110. As a direct and proximate result of Defendant's reckless, willful, and wanton misconduct and/or the reckless, willful, and wanton misconduct of one or more of its employees or agents, Plaintiff sustained injuries of a personal, pecuniary, and permanent nature, including (but not limited to) serious bodily injuries, scarring, disfigurement, pain and suffering, mental anguish, medical expenses now and into the future, personal property losses and expenses, lost wages, loss of earning capacity, loss of enjoyment of life, and other damages to be proven at the trial of this matter.

111. With reasonable certainty, Plaintiff will require future medical treatment and will incur additional economic damages, including future medical bills, for his physical injuries and emotional distress directly and proximately caused by Defendant's reckless, willful, and/or wanton misconduct and/or the reckless, willful, and wanton misconduct of its employees or agents.

112.    Defendant is vicariously liable for its employees' or agents' reckless, willful, and/or wanton misconduct which directly and proximately caused injury to Plaintiff.

113.    Defendant's tortious conduct, and/or the tortious conduct of its employees or agents, warrants the imposition of punitive damages. Punitive damages are imposed as punishment for causing compensable harm, as a deterrent against similar misconduct by GM, its employees or agents, or others in the future, and to demonstrate society's disapproval.

114.    Upon the imposition of punitive damages, an award of Plaintiff's reasonable attorney's fees is also warranted. Such fees are an element of compensatory damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff John Kafel prays for judgment against Defendants General Motors LLC, in the amount in excess of $25,000.00 on his claims for compensatory damages and in the amount in excess of $25,000.00 on his claims for punitive damages as well as attorney fees.

Plaintiff also seeks costs and pre- and post-judgment interest from Defendant.

## JURY DEMAND

Plaintiff requests trial by jury on all counts.

Respectfully submitted,

/s/Tom Merriman
_____

Tom Merriman (0040906)
Ladi Williams (0081754)
MERRIMAN LEGANDO WILLIAMS & KLANG, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. tom@merrimanlegal.com
    ladi@merrimanlegal.com
 Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2020 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Tom Merriman
TOM MERRIMAN (#0040906)
Counsel for Plaintiffs

22